**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| MF<br><br>Plaintiff,<br><br>CHARLOTTE-MECKLENBURG BOARD OF EDUCATION<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. 3:26-cv-00735**<br><br><br>**JURY TRIAL DEMANDED** |

## PRELIMINARY STATEMENT

1. Plaintiff MF brings this action against Defendant Charlotte-Mecklenburg Board of Education ("CMS" or "the District") to enforce her rights under Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111–12117, as amended, which incorporates, through 42 U.S.C. § 12117(a), the powers, remedies, and procedures set forth in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 et seq., including its prohibitions against interference and retaliation, 29 U.S.C. § 2615, and its private right of action, 29 U.S.C. § 2617.

## PARTIES

2. Charlotte-Mecklenburg Board of Education ("CMS" or "the District") is a "person" within the meaning of 42 U.S.C. §§ 12111(7) and 2000e(a).
3. CMS is an "employer" and "covered entity" within the meaning of 42 U.S.C. §§ 12111(2) and 12111(5).
4. CMS is an "employer" within the meaning of the FMLA, 29 U.S.C. § 2611(4), including as a public agency covered by the Act.

5. At all times relevant to this action, Plaintiff was an employee of CMS within the meaning of the ADA.
6. At all times relevant to her FMLA claims, Plaintiff was an "eligible employee" within the meaning of 29 U.S.C. § 2611(2).
7. Plaintiff is an individual with a disability within the meaning of 42 U.S.C. § 12102 because she has migraines, chronic headaches, post-concussion syndrome, and attention-deficit/hyperactivity disorder (ADHD). These impairments substantially limit one or more of her major life activities, including concentrating, thinking, reading, sleeping, communicating, and working. Major life activities also include the operation of major bodily functions, including neurological and brain functions. 42 U.S.C. § 12102(2)(B). Plaintiff's impairments substantially limit her neurological and brain functions.
8. Plaintiff also has a record of having a disability within the meaning of 42 U.S.C. § 12102(1)(B).
9. Plaintiff is a qualified individual within the meaning of 42 U.S.C. § 12111(8) because she can perform the essential functions of her position, with or without reasonable accommodation.
10. Plaintiff has a known association and relationship with two individuals with disabilities within the meaning of 42 U.S.C. § 12112(b)(4): ATC, now eighteen years old, who has an intellectual disability, and MTC, now eight years old, who has a speech impairment and other health impairments. CMS knew that Plaintiff had served for years as the primary caregiver and educational decision-maker for both children.

## JURISDICTION AND VENUE

11. This Court has federal-question jurisdiction over the ADA and FMLA claims under 28 U.S.C. § 1331, 42 U.S.C. § 12117(a), and 29 U.S.C. § 2617(a)(2).

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant resides in Mecklenburg County, North Carolina, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Mecklenburg County and within this District.

13. On July 10, 2025, Plaintiff timely filed EEOC Charge No. 430-2025-03350 alleging disability discrimination, associational discrimination, and retaliation. Plaintiff received a Notice of Right to Sue on July 30, 2026, and files this Complaint within 90 days after receipt. All applicable administrative conditions precedent to Plaintiff's ADA claims have been satisfied.

## FACTUAL ALLEGATIONS

14. CMS hired MF in August 2017 as a K–6 teacher and rehired her in 2020 after a graduate-school leave. She was promoted to Literacy Facilitator in 2021, and was promoted to Assistant Principal at Albemarle Road Elementary School in 2023. Her professional experience was exclusively at the elementary level.

15. MF consistently received positive evaluations. She earned all Distinguished ratings (the highest of CMS's four performance tiers: Developing, Proficient, Accomplished, and Distinguished) as a Literacy Facilitator, and Proficient and Accomplished ratings as an Assistant Principal. Before 2025, she had never received discipline, a performance plan, or complaint.

16. On January 15, 2025, MF sustained a concussion and other injuries when a student with a disability in crisis headbutted her in the front of the head multiple times.

17. On January 22, 2025, MF, through legal counsel, filed a petition for contested case hearing in the North Carolina Office of Administrative Hearings on behalf of her disabled dependent, ATC.

18. On February 3, 2025, CMS Attorney Breanna Miller challenged MF's authority to act as ATC's parent and asked the Court to dismiss the petition due to lack of standing.

19. On March 6, 2025, Administrative Law Judge Karlene S. Turrentine declined to dismiss the petition for lack of standing and ordered MF to submit documentation establishing her authority to proceed on ATC's behalf. As discussed below, the standing issue was never finally determined, as the parties later settled the matter.

20. On March 7, 2025, Employee Relations representatives Stephanie Coggins and Dr. Susann Nash arrived at MF's workplace.

    a. They questioned MF for approximately ninety minutes and then required an immediate written statement without the break she explicitly requested.

    b. The interview largely focused on her relationship with ATC, and she was asked to recall events dating back to 2018.

21. In March 2025, at the recommendation of counsel in ATC's IDEA proceeding, MF applied for hardship caregiver status for ATC and MTC. Student Placement Specialist Viva Cowan denied the applications despite receiving all the forms required under N.C. Gen. Stat. § 115C-366. Ms. Cowan told MF she received direction from Attorney Miller to deny the applications.

22. On March 25, 2025, during mediation of ATC's due process proceeding, CMS Attorney Breanna Miller stated to MF and her counsel that MF had been referred to Employee Relations because she filed the due process petition and that, absent that filing, MF would not have been under investigation. Miller also refused MF's request for a nonretaliation provision in the settlement and continued to dispute MF's authority to act for MTC. She did agree to include a clause that she would not interfere with ATC's bus stop, which she later did anyway.

23. On March 26, 2025, MF escalated Ms. Cowan's denial to Walter Hall, Director of Student Placement, who approved the hardship caregiver applications for both children on March 30, 2025, stating he did not take orders from Attorney Miller because Student Placement had their own legal counsel who had reviewed and approved the applications.

24. On March 31, 2025, MF returned to mediation on behalf of ATC. CMS agreed in the resulting settlement to recognize MF as ATC's parent and educational decision-maker but declined to extend the same recognition as to MTC. The matter thereafter settled.

25. On April 17, 2025, another student with a disability kicked MF in the head multiple times, causing a second concussion and cervical spine injury. Both injuries were reported through CMS's workers' compensation process, and Principal Monica Palmer knew of MF's resulting migraines, headaches, visual symptoms, neck pain, and difficulties with attention, processing, and memory.

26. On May 8, 2025, more than two months after Ms. Coggins and Dr. Nash showed up to begin an investigation into MF at the direction of Attorney Miller, Associate Superintendent of Employee Relations, Larry Johnson, requested to meet with MF. MF

requested ADA accommodations in writing to be able to effectively participate in their meeting. Mr. Johnson stated that his office did not handle accommodations and required the meeting to proceed without pausing or rescheduling it.

27. At that meeting on May 9, 2025, Mr. Johnson issued a Letter of Reprimand.

    a. Although the investigation had focused substantially on MF's relationship with ATC, the reprimand addressed MTC and contained materially inaccurate statements concerning MF's role in MTC's life.

    b. The letter further directed that the reprimand be incorporated into her 2024–2025 summative evaluation and ratings.

    c. At the conclusion of the meeting when MF attempted to leave to go to her workers' compensation medical appointment, Mr. Johnson indicated he was unsure MF should drive because she seemed too impaired by the medication she had been prescribed.

28. Also on May 9, 2025, CMS Benefits Administrator Daphne Foushee disseminated MF's FMLA approval letter and confidential leave information to employees who had no identified role in administering MF's leave or accommodations, including one of MF's subordinate employees and an employee involved in District promotion decisions at the time.

29. Also on May 9, 2025, Walter Hall, who overruled the denial of MF's hardship caregiver applications for MTC and ATC was suspended, and subsequently resigned his position of over 20 years.

30. Since April 17, 2025 when MF sustained a second traumatic brain injury in short succession to the first one in January, MF's health continued to decline. She struggled

with concentration, memory, organization, and suffered from headaches more debilitating and frequent than ever before. She now took twice as long to complete tasks and found herself coming in late at night and on the weekends to keep up with her workload.

31. During the week of June 2, 2025, MF was experiencing a particularly bad flare up. The doctor assigned through workers' compensation presumed in May that her debilitating headaches may be stemming from her cervical spine injury and prescribed cyclobenzaprine. Although MF reported this medication helped with the headaches, she indicated it also made her feel very drowsy and impaired. The doctor recommended she continue it as she would likely build up a tolerance to those side effects.

32. On June 6, 2025, MF attempted to return to work from sick leave. When her condition worsened, Principal Palmer instructed her to go home. In a disoriented state, MF attempted to enter leave, sought medical care, and was ultimately hospitalized by June 9. MF was diagnosed with serotonin syndrome resulting from the interaction of cyclobenzaprine prescribed through CMS's workers' compensation provider and her other medications.

33. At 5:39 a.m. on June 10, 2025, MF notified Principal Palmer that she had been hospitalized and intended to seek FMLA leave. At 2:36 p.m. that same day, CMS suspended MF and disabled her system access.

    a. The suspension letter also prohibited MF from communicating with any current or former CMS employee or student. Because MF had worked in the District for nearly eight years and her dependents attended CMS schools, the restriction extended far beyond workplace communications and isolated her from much of her professional, social, and personal community.

b. Because her access had been disabled, MF could not use the normal intranet process to submit FMLA documents. She was able to submit everything on June 13 by obtaining direct contact information for the benefits department.

34. On June 14, 2025 CMS approved FMLA leave retroactive to June 6, 2025 through June 30, 2025 and lifted the formal suspension on June 18, but continued the access and communication restrictions throughout her leave, despite lifting her suspension. At this time MF asked once again how to request workplace accommodations and was finally directed to the correct individual.

35. On June 23, 2025, MF met with Benefits Director Melissa Dahmer concerning her accommodation requests. After that meeting, Ms. Dahmer separately consulted Principal Palmer regarding MF's requested accommodations. MF asked to participate in discussions concerning how the accommodations would operate in her position, but Ms. Dahmer declined.

36. On June 26, 2025, CMS issued an accommodation determination denying or modifying several of MF's requests, including denying certain requests on the ground that they conflicted with essential job functions. MF subsequently obtained restrictions from her workers' compensation physician addressing those same limitations, which CMS implemented. CMS's later implementation demonstrated that at least some of the requested modifications were feasible at the time she originally requested them.

37. Also on June 26, 2025, Principal Palmer completed MF's summative evaluation after the applicable deadline and without MF's input, incorporating language from the May 9 reprimand as Employee Relations had directed. MF did not receive this evaluation until August 19. Had MF received the evaluation on time, she would have been afforded the

opportunity to provide artifacts to improve ratings and/or a written response. All other employees were afforded this opportunity except for MF.

38. On July 1, 2025, immediately when MF's FMLA leave expired, Employee Relations required her to attend another multi-hour interrogation.

  a. Mr. Johnson prohibited her from using Otter.ai, a transcription software, although CMS had approved transcription in writing, and admitted that he and Ms. Dahmer had decided outside MF's presence that she could not use it in the meeting.

  b. MF provided Employee Relations with a physician's letter explaining the medical circumstances that resulted in her June hospitalization, including the symptoms associated with serotonin syndrome.

  c. At the conclusion of the interview, CMS issued a pre-prepared second suspension letter that was identical to the previously retracted suspension letter, except that the date had been changed.

  d. The suspension prevented MF from serving in an Assistant Site Director summer-school role for which she had already been hired. This caused lost leadership experience and professional development.

  e. MF expressed her desire to return to work and explained that her summer job was at a different location with different employees, and therefore there was no legitimate argument that allowing her to serve in the role could interfere with their investigation.

  f. Additionally, Mr. Johnson did not tell the summer-school Site Director that MF had been prohibited from reporting or communicating, which led to reputational harm because the Site Director believed MF intentionally abandoned her job.

g. The following summer, when Plaintiff reapplied for the same position and multiple other commensurate positions, she was not offered an interview for any of the positions and could not obtain any summer employment within the district, demonstrating the ongoing harm to MF caused by the District.

39. While MF remained suspended in July 2025, another local education agency offered her a principal position carrying materially higher compensation. Accepting that position would have required MF to resign from CMS while under active investigation. Under G.S. § 115C-326.20, a resignation within 30 days of a misconduct complaint or during an ongoing investigation is presumed to have resulted from that misconduct, and CMS was required to report any such resignation to the State Board of Education within five days. Because accepting the position would have triggered this presumption and mandatory report, placing her license at risk based on unsubstantiated allegations, MF could not accept the position. She thereby lost a concrete promotional opportunity, increased salary, and associated future earnings.

40. On July 10, 2025, CMS required MF to undergo another multi-hour Employee Relations interview covering substantially the same matters addressed on July 1.

a. During the interview, Dr. Nash mocked MF's hand and arm movements associated with ADHD. When MF became emotional, Nash mocked her for crying, stated that only guilty people cry, and told MF that an administrator should not become emotional even behind closed doors. Nash further stated, in substance, that MF's disability-related mannerisms made her

unsuitable to serve as an administrator and that she should return to the classroom.

b. Nash also continued to challenge MF's authority to act for ATC and threatened discipline if MF used transcription software that CMS had approved as an accommodation.

41. Throughout July 2025, Employee Relations interviewed numerous MF colleagues concerning her performance and conduct. Upon information and belief, multiple employees provided favorable information contradicting the allegations against MF, but those statements were not reflected in the investigative findings.

42. On July 30, 2025, CMS informed MF that the first investigation had concluded but that it had opened a new, unrelated investigation. CMS continued MF’s suspension for another 23 days without issuing a new suspension letter. Upon information and belief, Employee Relations reviewed MF’s emails and social media activity in an effort to find evidence of misconduct and prolonged her suspension while doing so. CMS ultimately did not substantiate the new allegation. The allegation came from an employee whose documented personal animus toward MF was known to Principal Palmer.

43. On August 19, 2025, after CMS agreed in the settlement concerning ATC that it would not interfere with his school placement or bus stop, CMS denied his request to use an alternate bus stop it had approved for the previous two school years. CMS stated that students in the Exceptional Children’s (“EC”) program, unlike students in the magnet program, were not entitled to use express bus stops. That explanation contradicted district policy allowing students to use existing bus stops regardless of where they live. ATC had

used the stop for two years, and other students in the same EC program continued to be allowed to use existing express stops.

44. On August 19, 2025, MF also received the June 26 summative evaluation for the first time and was ordered to return to Employee Relations again.

45. On August 21, 2025, CMS placed an investigative findings letter and second Letter of Reprimand in MF's personnel file.

    a. The second reprimand stated that it would be reflected in her 2025–2026 evaluation, carrying prior-year discipline into a new evaluation cycle.

    b. These disciplinary documents were signed by the Chief Human Resources Officer, Angela Wood. MF had never met or spoken with Ms. Wood directly at this point, though Ms. Wood would go on to direct MF's disciplinary reassignment and Directed Professional Development Plan, described below.

    c. The investigative findings and second Letter of Reprimand disciplined MF, in part, for an "unapproved absence" beginning June 6, 2025. CMS had already approved FMLA leave covering June 6 through June 30, with July 1 as MF's approved return date. The same "unapproved absence" allegation had appeared in both the June 10 suspension letter and July 1 re-suspension letter. CMS therefore continued to characterize MF's FMLA-approved absence as misconduct even after formally approving that same absence as protected leave.

46. CMS then reassigned MF on less than one business day's notice to Hawthorne Academy of Health Sciences, a high school, despite her exclusively elementary experience. She

was told to report at 6:30 a.m. the following morning, which was the day before school started for students.

47. The reassignment materially changed MF’s responsibilities, work environment, schedule, and conditions of employment. CMS imposed it without considering her accommodation needs. When MF asked to transfer to an elementary school compatible with her disability-related needs, Ms. Wood told her that no transfer would be permitted.

48. MF was given only one day to arrange childcare and enroll her dependent children in new schools.

    a. Because transportation could not be arranged immediately, MF was approximately 45 minutes late on several mornings while transporting the minor children in her care to school. CMS required MF to use four hours of leave for each such occurrence. Under the staff handbook, other employees were permitted to use "pink sheets" for absences of 90 minutes or less without charging leave.

    b. Although CMS typically assigns transportation within two to three days, MF missed nearly two weeks of work because no bus was assigned for ATC. A senior transportation official whom MF eventually reached explained that a flag had been placed on ATC's profile, blocking transportation from being assigned through the normal process. When MF asked who placed the flag, the official declined to say.

49. Upon information and belief, CMS interfered with her dependents’ bus stops and school placements and reassigned MF to a high school as part of a concerted effort to pressure MF into resigning, despite her repeated statements that she had no intention of doing so.

50. When MF challenged all of this retaliatory conduct through proper channels, CMS has continued to justify its actions by alleging that MF improperly designated herself as MTC's "Guardian" in PowerSchool, left campus without authorization, drove unsafely, and engaged in other unprofessional conduct. Those explanations are false, shifting, or selectively enforced.

   a. CMS initially accused MF of altering both children's records but abandoned the allegation as to ATC after MF explained that she had no administrative access to ATC's school records and it was therefore factually impossible. MF does not recall entering MTC's "Guardian" designation. CMS routinely used that field for non-custodial caregivers responsible for receiving school communications, separately from fields identifying legal custody. In PowerSchool, there is a separate "custody" checkbox and MF was shown screenshots that the box for custody next to her name was not checked for MTC or ATC.

   b. Further, CMS employees routinely entered the same "Guardian" designation for other noncustodial caregivers without requiring a court order or any supporting documentation. MF can identify dozens of such records, yet no other employees were instructed not to make these entries or investigated or disciplined for doing so.

   c. Additionally, CMS Student Placement later again listed MF as MTC's guardian after CMS Employee Relations ordered the designation removed. MF is currently listed as MTC's guardian in the student information system and she observed an

individual at student placement make this designation at the student placement office in August of 2025.

d. MF left campus only because Principal Palmer instructed her to do so. Video footage shows MF exiting slowly and cautiously, with a parent acting as her spotter, using the route Principal Palmer had taught her to take when leaving the front row during car line. No other employees, including Principal Palmer, were disciplined for using this route. Although CMS claimed that other employees used a spotter and MF did not, the video directly contradicts that explanation by showing a parent offering to serve as MF's spotter and assisting her as she safely and slowly exited the parking lot.

e. Upon information and belief, Employee Relations disregarded multiple witness statements that contradicted allegations of unprofessional conduct and instead relied on two employees with personal grievances arising from MF's staffing and evaluation decisions.

f. Additionally, in September and October 2025, Principal Palmer told MF that she wanted MF to return to Albemarle Road and had communicated that position to Associate Superintendent Dr. Felicia McKinnon. Palmer expressed this position particularly after she was finally informed that MF had suffered from serotonin syndrome, information that had previously been withheld from Palmer in an effort to lead her to believe that MF had not experienced a genuine medical emergency. Palmer further told MF that she felt pressured to support Employee Relations' negative characterization of MF because she feared becoming a target herself.

51. Following the reassignment, Ms. Wood directed Principal Sharon Bracey to place MF on a Directed Professional Development Plan and assign performance goals in areas in which MF had previously received Proficient or Accomplished ratings. Principal Bracey implemented the directive shortly after MF arrived at Hawthorne and before she had sufficient time to independently evaluate MF's performance.

52. Further, Principal Bracey was directed to insert specific language from Human Resources into MF's summative evaluation in June of 2026 (and this directive is outlined in the letter of reprimand) regardless of how MF performed in this role. Principal Bracey indicated to MF she would have no choice but to follow this directive unless MF was successful in getting it removed from her file before the summative deadline in June.

53. Principal Bracey never got the opportunity to follow through on this directive because she was involuntarily reassigned to a different school by Human Resources in February of 2026.

54. After Principal Bracey's reassignment, Principal Jennifer Clark became MF's supervisor. Clark later asked MF why she had left Albemarle Road and stated that she had heard MF performed well there and appeared to have enjoyed her work.

55. Clark subsequently evaluated MF independently as Accomplished in six of seven standards and Proficient in the remaining standard, including Accomplished ratings in areas where MF had been rated Developing the prior year. Principal Clark's ratings were similar to those Principal Palmer gave MF before being instructed to retaliate against her, and further indicates that the negative ratings did not reflect legitimate performance deficiencies.

56. Following MF's reassignment, MTC was required to change schools. He subsequently experienced significant disability-related difficulties, and his medical providers recommended a transfer.

57. Kalisa Norman, then Director of Exceptional Children's Accountability and Compliance, agreed that the placement was not meeting MTC's disability-related needs and asked her colleagues in the Student Placement Office to consider a transfer. On April 2, 2026, Associate Superintendent Teresa Surbeck, who oversees student placement, denied the transfer without providing an individualized explanation.

58. Because MTC's medical team stated he could not return, MF was forced to apply for FMLA leave again and file another due process complaint.

59. In 2026, MF sought intermittent FMLA leave to care for MTC. CMS initially informed MF that she could not qualify as MTC's parent for FMLA purposes without a court order or birth-certificate designation.

60. After MF explained that the law did not require a biological or legal relationship and provided supporting documentation, CMS informed her that intermittent leave would be approved only if she identified the exact dates and hours in advance; otherwise, she would be required to take continuous leave. MF's supervisor raised these concerns with Human Resources and expressed that she wanted MF to take intermittent leave so that MF could continue working whenever she was able because of the value she brought to the school. A CMS representative thereafter advised MF to arrange a schedule directly with her supervisor instead of continuing through the FMLA process. Relying on that advice, MF withdrew her FMLA application. Upon information and belief, other

employees have been approved for FMLA and the associated job protections on an intermittent basis without providing exact dates and times of absence.

61. Only after the due process filing did CMS approve the transfer for MTC.

62. Shortly after Ms. Norman supported and recommended MTC's requested transfer, CMS involuntarily reassigned her from her position as Director of Exceptional Children's Accountability and Compliance. Before that reassignment, Ms. Norman had expressed concern to MF that CMS had become a "scary place" and that employees were afraid to follow the law or act in the best interest of students, stating that she could only do so much without risking her job.

**COUNT ONE**

**<u>Failure to Provide a Reasonable Accommodation</u>**

Americans with Disabilities Act, 42 U.S.C. §§ 12112(a) and 12112(b)(5)(A)

63. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

64. Plaintiff was a qualified individual with disabilities, CMS had actual notice of her limitations and express accommodation requests, and she could perform the essential functions of her Assistant Principal position with reasonable accommodation.

65. CMS failed to engage in a timely and good-faith interactive process and denied, delayed, or undermined reasonable accommodations, including flexible short breaks, removal from physically aggressive first-responder duties, and transcription software. CMS's subsequent implementation of some of the previously requested accommodations, once requested by the Workers' Compensation physician, further demonstrates that those accommodations were reasonable and feasible when originally requested by MF.

66. As a direct result, Plaintiff suffered lost wages and opportunities, exacerbation of her conditions, emotional distress, and other compensable harm, for which Plaintiff seeks compensatory damages to the fullest extent permitted by 42 U.S.C. § 1981a.

**COUNT TWO**

**Disability Discrimination – Disparate Treatment**

Americans with Disabilities Act, 42 U.S.C. § 12112(a)

67. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.
68. CMS subjected Plaintiff to reprimands, suspensions, a negative evaluation, denial of opportunities, and disciplinary reassignment because of disability, while other employees who engaged in comparable conduct were not similarly investigated or disciplined.
69. CMS's asserted reasons for its actions were pretextual, as demonstrated by contradictory records, shifting allegations, selective enforcement, coordinated disciplinary language, and MF's subsequent strong performance ratings under an independent supervisor.
70. Plaintiff suffered lost wages and benefits, lost career advancement, reputational injury, emotional distress, and other compensable damages.

**COUNT THREE**

**Disability Discrimination – Discrimination by Association**

Americans with Disabilities Act, 42 U.S.C. § 12112(b)(4)

71. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.
72. CMS knew that MF had longstanding caregiving and educational relationships with ATC and MTC, both individuals with disabilities. CMS initiated the Employee Relations investigation only after MF filed a due process proceeding on ATC's behalf, and CMS's attorney expressly stated that the filing caused the referral.

73. The timing and stated reason for the referral, the investigation's repeated focus on MF's relationships with ATC and MTC, and CMS's subsequent employment actions support the inference that CMS subjected MF to adverse treatment because of her known association with individuals with disabilities.

74. Plaintiff suffered lost wages and benefits, reputational injury, emotional distress, and other compensable damages.

**COUNT FOUR**

**Retaliation**

Americans with Disabilities Act, 42 U.S.C. § 12203(a)

75. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

76. Plaintiff engaged in protected activity by challenging disability-related discrimination against her, requesting accommodations, submitting a formal accommodation request, filing due process on behalf of her associated disabled dependents, and filing EEOC charges.

77. CMS thereafter subjected her to materially adverse actions, including two reprimands, repeated interrogations, lengthy suspensions and no-contact restrictions, a negative evaluation, loss of leadership opportunity, loss of a promotion and higher salary in a different local education agency, and disciplinary reassignment.

78. CMS's retaliatory conduct continued into 2026, including the Directed Professional Development Plan, continued denial of transfer, and continued obstruction of leave, all stemming from and perpetuating the same retaliatory response to Plaintiff's 2025 protected activity.

79. The adverse actions followed Plaintiff's protected activity in close temporal proximity and were accompanied by additional evidence of retaliatory motive, including a direct admission that protected activity prompted the initial referral, materially shifting and inconsistent explanations for subsequent employment actions, departures from ordinary procedures, and more favorable treatment of similarly situated employees who had not engaged in protected activity. These circumstances demonstrate that CMS subjected Plaintiff to the adverse actions because she engaged in activity protected by the ADA and that CMS's stated reasons for its actions were pretextual.

80. Plaintiff suffered lost wages and benefits, reputational injury, emotional distress, and other compensable damages.

**COUNT FIVE**

**<u>Interference with and Retaliation for Exercise of FMLA Rights</u>**

Family and Medical Leave Act, 29 U.S.C. §§ 2615(a)(1) and 2615(a)(2)

81. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

82. MF was an eligible employee under the FMLA and provided CMS notice of her need for protected leave. CMS approved FMLA leave from June 6 through June 30, 2025, with July 1 as her approved return date.

83. Despite approving the absence as FMLA leave, CMS repeatedly characterized the same June 6–30 absence as unauthorized misconduct in disciplinary documents, including documents issued after CMS had formally approved the leave.

84. CMS further subjected MF to an immediate disciplinary interview and re-suspension on July 1, 2025, the first day following her protected leave. The resulting suspension caused

MF to lose a summer leadership position and contributed to the loss of a higher-paying employment opportunity.

85. In 2026, CMS also interfered with MF's attempt to obtain intermittent FMLA leave to care for MTC by initially requiring a biological or legal parental relationship inconsistent with the FMLA policies CMS itself provided and thereafter imposing advance scheduling requirements that caused MF to withdraw the FMLA request and instead arrange leave informally with her supervisor.

86. CMS's repeated treatment of approved FMLA leave as misconduct, its immediate disciplinary interview and re-suspension of MF upon her return from protected leave, and its later imposition of improper requirements that caused MF to abandon her request for intermittent FMLA leave demonstrate that CMS both interfered with MF's exercise of FMLA rights and retaliated against her for exercising or attempting to exercise those rights.

**COUNT SIX**

**<u>Interference with FMLA Rights — Unauthorized Disclosure of Confidential FMLA Records</u>**

Family and Medical Leave Act, 29 U.S.C. § 2615(a)(1) and 29 C.F.R. § 825.500(g)

87. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

88. The FMLA requires that records and documents relating to certifications, recertifications, or medical histories created for purposes of FMLA leave, including records reflecting an employee's approved leave dates and leave status, be maintained as confidential medical records, separate from an employee's usual personnel file, and disclosed only to

supervisors regarding necessary work restrictions, to first-aid or safety personnel, or to government officials investigating compliance. 29 C.F.R. § 825.500(g).

89. On May 9, 2025, CMS Benefits Administrator Daphne Foushee disclosed Plaintiff's confidential FMLA information to personnel not authorized to receive it, including an employee involved in promotions for the District and a subordinate at Plaintiff's school.

90. This disclosure served no purpose permitted under the FMLA's narrow exceptions and was not made to a supervisor regarding necessary work restrictions, to first-aid or safety personnel, or to a government official investigating compliance.

91. As a direct result, Plaintiff suffered reputational injury, professional harm, emotional distress, and other compensable damages.

**COUNT SEVEN**

**<u>Disability Harassment — Hostile Work Environment</u>**

Americans with Disabilities Act, 42 U.S.C. §§ 12111 et seq.; see *Fox v. Gen. Motors Corp.*, 247 F.3d 169 (4th Cir. 2001)

92. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

93. Plaintiff, a qualified individual with disabilities, was subjected to unwelcome conduct because of her disabilities. This conduct included CMS's refusal to pause or reschedule a disciplinary meeting despite her request for accommodations and subjecting her to repeated, multi-hour interrogations without accommodation. It also included Associate Superintendent of Employee Relations Larry Johnson questioning whether Plaintiff was too impaired by prescribed medication to drive, and Director of Employee Relations Dr. Nash mocking Plaintiff's ADHD-related hand and arm movements, mocking her for crying, telling her that only guilty

people cry and that an administrator was not permitted to become emotional even behind closed doors, and suggesting that her disability-related mannerisms made her unfit to be an administrator and that she should return to a classroom position, which would have resulted in a demotion in status and pay.

94. This conduct was sufficiently severe and pervasive to alter the conditions of Plaintiff's employment and create a hostile working environment.

95. This conduct was carried out by CMS's own Employee Relations personnel and supervisors, and CMS failed to take any corrective action, despite being on notice.

96. As a direct result, Plaintiff suffered emotional distress, exacerbation of her medical conditions, and other compensable damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff MF respectfully requests that this Court:

A. Declare that Defendant Charlotte-Mecklenburg Board of Education violated the ADA by failing to provide Plaintiff with reasonable accommodations for her known disabilities and by failing to engage in a good-faith interactive process;

B. Declare that Defendant violated the ADA by subjecting Plaintiff to disparate treatment on the basis of her disabilities;

C. Declare that Defendant violated the ADA's association discrimination provision by targeting Plaintiff for her association with her disabled dependents;

D. Declare that Defendant violated the ADA by retaliating against Plaintiff for engaging in protected activity;

E. Declare that Defendant violated the FMLA by interfering with and retaliating against Plaintiff for exercising her FMLA rights;

F. Award Plaintiff all past and future lost wages and benefits, plus pre- and post-judgment interest;

G. Award Plaintiff compensatory damages for emotional distress, career harm, and other non-economic injuries;

H. Award Plaintiff liquidated damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii) for Defendant's willful violations of the FMLA;

I. Order Defendant to expunge the July 1, 2025 Suspension Letter, the May 9, 2025 and August 21, 2025 Letters of Reprimand and the negative 2024-2025 summative evaluation from Plaintiff's personnel file;

J. Order Defendant to transfer Plaintiff to her previous elementary Assistant Principal position or a comparable position with a bell schedule that accommodates her disability;

K. Award Plaintiff all reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 12117(a) and 29 U.S.C. § 2617(a)(3); and

L. Grant Plaintiff such additional and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims properly triable by a jury.

Dated: September 16, 2026

Charlotte, North Carolina

Respectfully submitted,

/s/Carla Fassbender
N.C. State Bar No. 55210
Fassbender Law, PLLC
1251 Ostwalt Amity Road
Cleveland, NC 27013
704-978-8797

carla@fassbenderlaw.com
Counsel for Plaintiff

Marica Ellsworth
Peterson Russell Kelly Livengood
1850 Skyline Tower, 10900 N.E. 4th Street
Bellevue, WA 98004
425-990-4019
Mellsworth@prklaw.com
Application for admission pro hac vice pending